SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
JOHN T. BROOKS, Cal. Bar No. 167793
JOHN F. BURNS, Cal. Bar No. 290523
SAMUEL DUIMOVICH, Cal. Bar No. 301158
MEGAN K. MCKISSON, Cal. Bar No. 336003
501 West Broadway, 18th Floor
San Diego, California 92101-3598
Telephone:  619.338.6500
Facsimile:  619.234.3815
Email:      jbrooks@sheppardmullin.com
            jburns@sheppardmullin.com
            sduimovich@sheppardmullin.com
            mmckisson@sheppardmullin.com

Attorneys for Plaintiff
KAISER FOUNDATION HEALTH PLAN, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| KAISER FOUNDATION HEALTH PLAN, INC., | Case No. _____ |
|---|---|
| Plaintiff, | **COMPLAINT FOR:**<br>1. Fraud<br>2. Negligent Misrepresentation<br>3. Unjust Enrichment/Restitution<br>4. Unfair Competition |
| vs. | |
| TIERO LLC and SAJAD ZALZALA, M.D., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Kaiser Foundation Health Plan, Inc. ("Kaiser") brings this action against Defendants Tiero LLC ("Tiero") and Sajad Zalzala, M.D. ("Zalzala," and collectively with Tiero, "Defendants") and alleges as follows:

## PRELIMINARY STATEMENT

1. For several years, Tiero and Zalzala took advantage of the COVID public health emergency to fraudulently bill Kaiser for thousands of laboratory COVID tests that they never performed. Specifically, Defendants conceived and implemented a scheme to provide the public with over-the-counter, at-home COVID tests but charged Kaiser as if they were laboratory-performed tests. These at-home tests retail for around $12, and upon request the federal government would ship several tests to every household for free. Yet, Defendants charged Kaiser roughly ten times the retail value – $100 per test.

2. Moreover, when Defendants billed Kaiser for services, they chose not to use the universally recognized billing code for at-home COVID tests but rather used billing codes related to laboratory-performed tests. And while Defendants took orders online and provided tests exclusively through the mail without seeing patients, Defendants' invoices reported to Kaiser that the test was performed during an in-office visit. In other words, Defendants lied to Kaiser to procure payment for work that they did not perform in offices that patients never visited.

3. As a result of Defendants' fraudulent scheme and illegal behavior, Defendants wrongfully received and wrongfully retain millions of dollars from Kaiser. Kaiser and its members suffered millions of dollars in damages.

## PARTIES

4. Kaiser is a nonprofit health care service plan incorporated in the state of California. Kaiser's principal place of business is One Kaiser Plaza, Oakland, California 94612. Kaiser's largest service area by member count – at roughly 4.9 million members – is Southern California. The substantial majority of these members reside and receive care in the Central Coast, Coachella Valley, the Inland

1  Empire, Metro Los Angeles and Los Angeles County, Orange County, and Ventura
2  County.  Several Kaiser executives also maintain an office in the City of Pasadena.
3       5.    Defendant Tiero LLC is a Delaware limited liability company, with its
4  principal place of business at 9801 Washingtonian Boulevard, Suite 200,
5  Gaithersburg, Maryland.  Upon information and belief, Tiero's sole member is
6  URock LLC, a Delaware limited liability company.  Upon information and belief,
7  none of the members of URock LLC are domiciled in California.
8       6.    Defendant Sajad Zalzala, M.D. is an individual domiciled in Michigan.

## JURISDICTION AND VENUE

10       7.    Kaiser brings this action under 28 U.S.C. § 1332 because the parties are
11  completely diverse in citizenship and the amount in controversy exceeds $75,000,
12  excluding interests and costs.  Therefore, the Court has subject matter jurisdiction
13  over the claims.
14       8.    Kaiser also brings this action under 29 U.S.C. § 1331 because the case
15  involves a question about federal law, including without limitation the application of
16  the Families First Coronavirus Response Act, 116 P.L. 127 (2020) ("FFCRA"),
17  Coronavirus Aid, Relief, and Economic Securities Act, 116 P.L. 136 (2020)
18  ("CARES Act"), and Centers for Medicare & Medicaid Services ("CMS") guidance
19  concerning coding of medical services.  *See California ex rel. Lockyer v. Dynegy,*
20  *Inc.*, 375 F.3d 831, 841 (9th Cir. 2004) (federal court had jurisdiction over state
21  unlawful competition claim that borrowed from federal law).
22       9.    This Court has personal jurisdiction over Tiero and Zalzala because
23  each willing maintained significant contacts in California, including advertising in
24  this state to California residents, accepting thousands of requests for COVID tests
25  from California residents, shipping thousands of COVID tests to California
26  residents, billing California companies, including Kaiser, for the COVID tests, and
27  otherwise performing acts in this state, including this district.
28

10. This Court also has personal jurisdiction over Zalzala because, among other things, he agreed and conspired with Tiero to submit the fraudulent claims at issue to Kaiser related to Kaiser members in this District, and permitted Tiero to use his National Provider Identifier, which Tiero needed and used to submit claims to Kaiser for Kaiser members from this District.  Based on information and belief, Kaiser alleges that Zalzala also was licensed as a medical doctor in California and used that license to further the Defendants' illegal scheme to defraud Kaiser in the state.

11. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events occurred in this District.  On information and belief, Tiero advertised their services in this District.  Defendants also accepted requests for tests from thousands of residents in this District, mailed out thousands of tests to residents in this District, and billed Kaiser for tests on behalf of members residing in this District.

## FACTUAL BACKGROUND

### Kaiser Foundation Health Plan, Inc.

12. Kaiser is a nonprofit corporation that arranges for the provision of healthcare services and benefits to its members through the Kaiser Permanente integrated care delivery system, which includes Kaiser Foundation Hospitals and several medical groups.  In a time of ever-increasing healthcare costs and rampant charges for life-saving services, Kaiser Permanente strives to provide high-quality healthcare at an affordable price.  By doing so, Kaiser can offer affordable coverage at a time when more physicians are leaving the practice and costs are exponentially increasing.  It can offer healthcare to at-risk and underserved populations, including seniors.  Kaiser's system and mission also allow it to give back millions to support community health, including care for the housing-insecure population.


**The Government requires health plans to pay for COVID tests, but enacted guardrails to prevent overbilling**

13. The COVID pandemic wrought havoc on the United States and the world. In response, the federal and state governments acted quickly to pass laws and regulations that promoted the diagnosis and treatment of COVID. To meet this goal, governments required health plans to provide coverage for various types of COVID tests regardless of whether the test was offered by a provider "in network" or not. *See* Public Law 116-127 § 6001 (FFCRA); Public Law 116-136 §§ 3201 – 3202 (Cares Act); Cal. Health & Safety Code § 1342.2. These laws allowed Kaiser members to seek COVID tests at any provider, not just Kaiser facilities or facilities contracted with Kaiser. Moreover, these laws also required Kaiser to cover the member's share of the test, including any co-pay, co-insurance, and deductible. In other words, Kaiser had to pay for the COVID test no matter who performed it, with limited exceptions.

14. Such a regime provided unscrupulous providers a means to take advantage of the pandemic and charge exorbitant amounts for COVID tests. In response, the various governments enacted guardrails to protect payors and the public from such bad actors. Examples include:

- <u>Federal cap on charges</u>: Unless a provider entered a contract with a health plan, the FFCRA/CARES Act required providers to charge health plans their cash rate for diagnostic tests. Providers were not allowed to collect their unilaterally set billed charges that practically no one pays. *See* Public Law 116-136 §§ 3201 – 3202 (Cares Act).
- <u>State cap on charges</u>: To the extent a COVID test was not covered by the federal cash-price law, California capped the amount that a health plan had to pay for a test at its "reasonable value," not to exceed 125% of the amount that Medicare would pay for the same test. *See* Cal. Health & Safety Code § 1342.2; Department of Managed Healthcare,

April 25, 2022 All Plan Letter 22-014. Beginning on November 11, 2023, California's cap is 125% of the amount that Medicare would pay. Department of Managed Healthcare, December 27, 2022 All Plan Letter 22-032.

- At-Home tests: To encourage testing while reducing costs and burdens, the federal and state government required health plans to pay for up to eight at-home diagnostic tests per member per month, subject to various conditions. These tests allowed members to conduct tests without the expense of laboratory processing. Notably, allowable charges for the tests were limited, often to $12 per test.

- *See* FAQs Part 51 re Implementation of FFCRA and CARES Act, available at https://www.dol.gov/sites/dolgov/files/ EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-51.pdf; Department of Managed Healthcare, April 25, 2022 All Plan Letter 22-014.

- Free at-home tests: The federal government also announced that any family in the country could receive several free COVID-tests.

- Specific CPT Codes: The Centers for Medicare and Medicaid (CMS) adopted specific and universal codes to identify the exact type of test rendered. For example, Healthcare Common Procedure Coding System ("HCPCS") code 87426 represents an antigen test using an immunofluorescent or immunochromatographic technique for the detection of COVID through a laboratory-based test. It is a code contained in the group of codes related to tests performed by a physician or by another person under the supervision of a physician. On the other hand, code K1034 represents an over-the-counter, at-home COVID test.

15. Nearly all the state and federal rules concerning COVID testing were in effect by the start of 2022. These rules led to a dramatic increase in the number of

claims that Kaiser would receive and process. In fact, by 2022, Kaiser received and processed millions of claims per month and averaged more than a million additional claims per month compared to the year before the pandemic. Like most large health plans and payors, much of Kaiser's claim processing is automated.

**Tiero overcharged Kaiser for at-home tests**

16. Included within the millions of claims per month that Kaiser received were claims submitted by Tiero. From March 2020 through 2023, Tiero submitted over 80,000 claims to Kaiser involving close to 10,000 members and over $8.1M in charges for purported COVID tests performed by Tiero on Kaiser members. Each test was billed using the HCPCS Code 87426 (lab-based, physician supervised test). None of Tiero's claims used the code K1034 (at-home test) or otherwise identified the test as an at-home test.

17. Moreover, each of Tiero's claims to Kaiser used the Place of Service code 11 and identified Zalzala as the referring and/or the rendering provider. Place of Service code 11 means a location where the provider routinely provides health examinations, diagnosis, and treatment on an ambulatory basis. *See* Centers for Medicare & Medicaid Servs., Place of Serv. Code Set (Sept. 2021), https://www.cms.gov/Medicare/ Coding/place-of-service-codes/Place_of_ Service_Code_Set. In other words, Tiero represented that it performed every test in person at Zalzala's office or under his care at a Tiero facility.

18. Providers, including Tiero, typically do not submit medical records with their invoices unless the payor, like Kaiser, requests the records. Instead, both by industry custom and necessity, Kaiser processes received claims through a predominantly automated process that pays claims as coded, unless the claim is flagged for further review. Kaiser and the industry at large rely upon providers to submit truthful, accurate, and correct information on claims. Kaiser is informed and believes that providers and billing entities, including, Tiero and Zalzala, understand that Kaiser uses automated processes to pay claims in accordance with their coding

and that Kaiser relies on the information contained on a claim to pay the claim. Defendants also have knowledge that using a code that does not describe or accurately reflect the services provided can cause health plans like Kaiser to pay for services that were not provided at all, pay for services other than the services actually provided, and/or otherwise overpay for services.

### At-Home COVID-19 Diagnostic Tests and Applicable Regulations

19. Starting January 1, 2022, the state of California required health plans to cover the cost of eight monthly FDA-approved at-home COVID tests. The federal government mandated similar coverage beginning on January 15, 2022.[1] Under California and federal law, if a health plan established a process to provide at-home tests to enrollees, health plans could cap reimbursement at $12 per test.

20. Beginning no later than April 4, 2022, CMS instructed healthcare providers to use HCPCS code K1034 to bill for each OTC at-home COVID-19 test.[2] HCPCS code K1034 "applies to all OTC, FDA-approved, authorized, or cleared COVID-19 tests (that are self-administered with a specimen that's self-collected)." The guidance has not changed in the past 18 months.

### The Defendants' Business Model Relies on At-Home Tests

21. Upon information and belief, for the last several years, Tiero primarily marketed itself as a provider of at-home COVID test kits that it would send through

---

[1] *See* U.S. Dep't of Health & Human Servs., *Bide-Harris Administration requires Insurance Companies and Group Health Plans to Cover the Cost of At-Home COVID-19 Tests, Increasing Access to Free Tests* (Jan. 10, 2022), https://www.hhs.gov/about/news/2022/01/10/biden-harris-administration-requires-insurance-companies-group- health-plans-to-cover-cost-at-home-covid-19-tests-increasing-access-free-tests.html.

[2] Centers for Medicare & Medicaid Servs., *COVID-19 Over-the-Counter Tests* (Apr. 4, 2022), https://web.archive.org/web/20220404183740/https://www.cms.gov/COVIDOTCtestsProvider.

the US Mail, using at least two different websites to offer services, including tiero.com and freetest.com. It appears that with the end of the declared COVID public health emergency, Tiero has stopped providing services to new patients. *See* https://www.tiero.com/.

22. Tiero advertises that it provides "free at-home COVID-19 tests" and operates an online website from which anyone with health coverage can order tests to be shipped to the person's home every month. Tiero advertises these tests as "ZERO cost."[3]

23. Tiero advertises the process for receiving tests: (1) an individual first registers with Tiero and provides health plan information; (2) Tiero submits a claim to the individual's health plan; and (3) if the individual's health plan accepts the claim and agrees to pay, Tiero ships tests monthly to the person's home or workplace.

24. Zalzala is a medical doctor based in Michigan. However, with Zalzala's permission, Tiero identifies Zalzala as the referring provider for every COVID test it bills to Kaiser. Zalzala was also often listed as the rendering provider, along with Dr. David Kossoff (Tiero's authorized official) and Tiero itself.

25. Upon information and belief, Zalzala agreed with Tiero to allow it to use his name and National Provider Identifier ("NPI") to bill for all claims submitted by Tiero to Kaiser. Tiero's NPI identifies Zalzala as its "authorized official" and "Doctor of Record".

**The Defendants' Fraudulent Scheme**

26. Tiero engaged in extensive marketing to cause Kaiser members to sign up for purportedly "free" at-home COVID-19 tests through Tiero.

27. While Tiero received inquiries from Kaiser members to mail them at-home COVID tests that did not require any physician or technician administration or

---

[3] https://online.tiero.com/tiero/signup.

interpretation, Tiero billed Kaiser for a more sophisticated and costly COVID antigen test that required a laboratory to process the test and determine a result. Tiero falsely identified the test as a such a test by using HCPCS code 87426.[4] Tiero did not use the code that was designated for at-home tests, even though most of the tests provided were distributed after HCPCS code K1034 was established. Tiero did not use a code or notation that reflected the test was an at-home test administered by the member. Tiero did not contact Kaiser to notify it about the type of test it actually was providing or to ask how it should bill for at-home tests to avoid misleading Kaiser. And Tiero did not otherwise indicate it was providing at-home test.

28. To the contrary, Tiero tried to hide the true nature of the test by also indicating the test was provided at an office visit with place-of-service code 11, even though Kaiser members never went to an office or ever communicated with any physician, including Zalzala.

29. Tiero also billed Kaiser as if it already performed the test – or performed it on the day the claim was sent – and did not indicate the claim was for a test not yet performed or even mailed. By waiting for Kaiser to pay the claim before mailing out a test, Tiero misrepresented not only the type of test and location of test, but also the date of the test and the fact that no test had yet been performed at the time it was billed.

30. In addition, when Tiero billed Kaiser for multiple COVID tests that it planned to mail to a member on the same day (often, eight tests at once), it would

---

[4] HCPCS code 87426 is defined as: "Infectious agent antigen detection by immunoassay technique (e.g., enzyme immunoassay [EIA], enzyme-linked immunosorbent assay [ELISA], fluorescence immune [FIA], immunochemiluminometric assay [IMCA]), qualitative or semiquantitative, severe acute respiratory syndrome coronavirus (e.g., SARS-CoV, SARS-CoV- 2 [COVID-19])."

not bill the tests all at once. Rather, it split them up and billed them as tests rendered on three different days. For example, a common approach would be to bill Kaiser for three tests on day one, three tests on day two, and two tests on day three. Kaiser is informed and believes that Tiero did this, in part, to avoid Kaiser's billing system flagging the claims for further review.

31. Kaiser is also informed and believes that some members never received tests from Defendants even though Defendants billed and received payment from Kaiser. Other members received tests months after Tiero was paid by Kaiser and only after Kaiser reached out to Defendants concerning their fraudulent scheme.

32. When the Defendants submitted claims to Kaiser, they inaccurately identified Zalzala on their claims as the "referring provider," when actually patients were identified by Defendants through direct advertising or other means but not through a referral by Zalzala. Kaiser is not aware of a single member receiving an actual referral from Zalzala for a test. By listing Zalzala as a referring provider, Defendants attempted to further hide that the tests were at-home tests rather than laboratory-performed tests.

33. If Defendants had correctly coded the at-home tests or notified Kaiser of the true nature of the tests, then the claims would have been paid at substantially lower rates than the Defendants were paid because of their fraud, or not paid at all.

**Kaiser Paid Tiero More than $3.2 Million in Fraudulent Claims**

34. Kaiser paid Tiero millions of dollars for at-home COVID tests, and at least $3.2 million more than it would have paid Tiero even if it paid for every test at the maximum rate of $12.

**CLAIMS FOR RELIEF**

**Cause of Action I: Fraud**
**(All Defendants)**

35. Kaiser incorporates paragraphs 1 through 34 as if fully set forth herein.

36. Between early 2020 and the present, Tiero and Zalzala submitted or caused thousands of false and misleading claims to be submitted to Kaiser for at-home COVID tests.

37. On such claims, Tiero, and Zalzala made numerous false representations and/or omitted material information, including, without limitation, the type of tests they provided, whether the test was a laboratory-based test overseen by a physician or a self-administered, at-home test, the location where the test was provided, the number of tests provided, the date the tests were provided, whether a test was performed, whether a test was provided, and whether or not the tests were referred by a physician. On information and belief, Defendants were aware of CMS guidance concerning the use of COVID-related CTP codes, and understood the application of CTP codes generally, yet intentionally disregarded that guidance and failed to use correct and non-misleading codes.

38. These misrepresentations and omissions were material and Kaiser relied on them in payment of claims that the Defendants submitted to Kaiser.

39. Upon information and belief, Tiero and Zalzala knew that their representations were false or had no reasonable basis to believe in the truth of their representations. Defendants also knew that Kaiser was unaware of the true facts and chose not to provide facts to correct Kaiser's knowledge.

40. Tiero and Zalzala intended and expected that Kaiser would rely on these representations in paying the claims they submitted to Kaiser.

41. On information and belief, Defendants also knew that Kaiser and other health plans and insurers received claims for millions of COVID tests during the period in dispute and cannot investigate or audit every claim. Rather, providers and billing companies understand that health plans rely on the accuracy of claims and certify the accuracy of the claims they submit. Upon information and belief, Tiero and Zalzala had the same understanding.

42. Tiero and Zalzala intended to obtain payments from Kaiser to which they were not entitled.

43. Kaiser did not know that the Defendants' representations were false.

44. Kaiser reasonably and justifiably relied on these misrepresentations in paying claims submitted by Tiero and Zalzala.  In addition, federal and state law required Kaiser to pay the submitted claims as submitted and in short timeframes.

45. Kaiser reasonably relied on the truthfulness of the information Tiero and Zalzala included in the claims they submitted to Kaiser or caused to be submitted to Kaiser.

46. Kaiser has been damaged by Defendants' misrepresentations in that Defendants deceived Kaiser into overpaying millions of dollars on their claims.

## Cause of Action II: Negligent Misrepresentation
### (All Defendants)

47. Kaiser incorporates paragraphs 1 through 46 as if fully set forth herein.

48. Tiero and Zalzala submitted claims containing material misrepresentations and/or material omissions, or caused such claims to be submitted, including those described above.

49. Upon information and belief, Tiero and Zalzala knew their representations were false or misleading, made them without knowledge of their truth or falsity, or made them when they ought to have known of their falsity.

50. Tiero and Zalzala intended or expected that Kaiser would rely on the false information to induce Kaiser in its payment of those claims.

51. Providers and billing companies understand that insurers rely on the accuracy of claims and the certification of accuracy in the claims they submit. Upon information and belief, Tiero and Zalzala had the same understanding.

52. Kaiser did not know that the foregoing representations were false, and reasonably and justifiably relied on these representations in paying claims submitted by the Defendants.

53. Kaiser reasonably relied on the truthfulness of the information Tiero and Zalzala included in the claims they submitted to Kaiser.

54. Tiero and Zalzala had superior and special knowledge of the material misrepresentations, which was not reasonably discoverable through ordinary observation.

55. Kaiser has been damaged as a direct and proximate result of the Defendants' misrepresentations, in that they caused Kaiser to overpay the Defendants by millions of dollars.

### Cause of Action III: Unjust Enrichment/Restitution
### (All Defendants)

56. Kaiser incorporates paragraphs 1 through 55 as if fully set forth herein.

57. Tiero knowingly received and accepted a benefit from Kaiser in the form of payments for COVID-19 test claims.

58. Upon information and belief, Tiero subsequently transferred a portion of the payments made by Kaiser to Zalzala.

59. Tiero and Zalzala received this benefit at Kaiser's expense.

60. The circumstances are such that it would be unjust for Tiero or Zalzala to retain this benefit.

61. It would be unjust for Tiero or Zalzala to retain payments made by Kaiser when the Defendants:

    a. should not have billed the tests to Kaiser;

    b. billed incorrectly for a type of test with a higher payment rate;

    c. billed with incorrect dates of service to circumvent Kaiser's reimbursement policies;

    d. billed for a referring provider who was not, in fact, a referring provider, but a provider who gave his NPI to the other Defendants to use as they wished without supervision; and

    e. did not provide some of the tests to Kaiser members.

62. The Defendants' conduct in connection with these payments was inequitable and unlawful, as detailed above.

63. Accordingly, in equity and good conscience, Kaiser is entitled to the return of funds it paid to Tiero under the foregoing circumstances.

## Cause of Action IV: Unfair Competition
### (All Defendants)

64. Kaiser incorporates paragraphs 1 through 63 as if fully set forth herein.

65. Under California Business and Professions Code section 17200 *et seq.*, unfair competition includes any unlawful, fraudulent, or unfair business practice or act.

66. Defendants have engaged in unfair competition in the following ways:
   a. Defendants overcharged Kaiser by incorrectly billing for a type of test with a higher payment rate;
   b. As set forth herein, Defendants acted fraudulently toward Kaiser to procure payment for COVID tests not performed;
   c. Defendants made false representations to Kaiser, on documents sent through the mail and wire; and
   d. Defendants did not convey the true nature of the services that it provided to Kaiser.

67. Upon information and belief, Tiero subsequently transferred a portion of the payments made by Kaiser to Zalzala.

68. Kaiser seeks restitution of the money that Defendants acquired by means of its unfair competition. Kaiser also seeks an injunction prohibiting Defendants from continuing its unfair business practices set forth herein, including misrepresenting the tests it provides to Kaiser members.

## **PRAYER FOR RELIEF**

WHEREFORE, Kaiser respectfully requests judgment in its favor and:

1. Actual and compensatory damages;

-15-

1 | 2. Restitution of money taken and wrongfully withheld;
2 | 3. Punitive damages;
3 | 4. Injunctive relief as requested herein;
4 | 5. Prejudgment and post-judgment interest; and
5 | 6. Any other relief that the Court deems just and proper.

Dated: October 31, 2023

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By  */s/ John T. Brooks*
JOHN T. BROOKS
JOHN F. BURNS
SAMUEL DUIMOVICH
MEGAN K. MCKISSON
Attorneys for Plaintiff
KAISER FOUNDATION HEALTH PLAN, INC.

## JURY TRIAL DEMAND

Kaiser demands a trial by jury for causes of action eligible for a jury trial.

Dated: October 31, 2023

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By   */s/ John T. Brooks*
JOHN T. BROOKS
JOHN F. BURNS
SAMUEL DUIMOVICH
MEGAN K. MCKISSON
Attorneys for Plaintiff
KAISER FOUNDATION HEALTH PLAN, INC.